T.C. Memo. 2020-60

UNITED STATES TAX COURT

ABIGAIL RICHLIN, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 16301-16L.                       Filed May 18, 2020.

        P and her late husband, M, filed a joint return for 2005 and
elected to apply the overpayment shown on that return to their
estimated tax for 2006.  M made additional estimated payments for
2007 between June 2006 and January 2007 and also made a payment
with a request for an extension of time to file a 2006 return.  P and M
divorced in January 2007 and M died the following August.  P filed a
separate return for 2006 in which she claimed credit for half of the
2005 overpayment, the estimated payments M made between June
2006 and January 2007, and M's extension payment.  R issued a
notice of Federal tax lien concerning the collection of unpaid tax
liability of P for 2006.  After a collection due process (CDP) hearing,
P and R's Appeals Office (Appeals) executed a summary notice of
determination on Form 12257, Summary Notice of Determination,
Waiver of Right to Judicial Review of a Collection Due Process
Determination, and Waiver of Suspension of Levy Action, stating that
the lien would be released because P was entitled to credit for the
payments shown on her return.  R then issued a notice of intent to
levy in regard to P's 2006 taxable year, which led to a second CDP

[*2] hearing and execution of a second Form 12257 that confirmed the result of the first. After M's estate claimed credit for the full amount of the payments in issue and Appeals received advice from counsel supporting the estate's claim, Appeals "continued" the second CDP hearing and, thereafter, issued a notice of determination upholding the proposed levy action.

Held: The Forms 12257 were not contracts that obligated R to refrain from further collection action concerning P's 2006 taxable year.

Held, further, Internal Revenue Manual pt. 8.22.9.13 (Nov. 13, 2013), which prohibits rescission of a notice of determination, does not apply to Forms 12257; consequently, Appeals was free to make a determination contrary to those reflected in the Forms 12257 without abusing its discretion.

Held, further, Appeals is not bound by equitable estoppel from making a determination contrary to those reflected in the Forms 12257 because (1) Appeals had no duty to inform P of the efforts of M's estate to secure credit for the payments in issue or its receipt of legal advice supporting the estate's position, and (2) P has not established detrimental reliance on Appeals' failure to inform her of those facts.

Held, further, because the evidence does not support Appeals' finding that M intended the estimated payments he made between June 2006 and January 2007 to have been for his own account, that finding was clearly erroneous.

Held, further, the doctrine of SEC v. Chenery Corp., 318 U.S. 80 (1943), does not require remand to Appeals as a result of its erroneous factual finding; M's estimated payments between June 2006 and January 2007, if treated as joint payments, should be allocated in the same manner as the joint 2005 overpayment.

**[*3]**    <u>Held</u>, <u>further</u>, an agreement between a husband and wife can govern the allocation, under sec. 1.6654-2(e)(5)(ii), Income Tax Regs., of joint estimated payments made for a year for which they file separate returns even if the agreement does not specifically address the allocation of estimated payments.

   <u>Held</u>, <u>further</u>, implementation of a general principle embodied in a premarital agreement between P and M requires the allocation of the payments in issue entirely to M's account; Appeals thus did not err as a matter of law in making that allocation.

<u>Robert D. Grossman, Jr.</u>, for petitioner.

<u>Miles B. Fuller</u>, for respondent.

## MEMORANDUM OPINION

HALPERN, <u>Judge</u>:  This case is before us to review a determination by the Internal Revenue Service (IRS) Appeals Office (Appeals) upholding the proposed collection by levy of Federal income tax (including a penalty and interest) allegedly owed by petitioner for her taxable year ended December 31, 2006.  The parties have submitted the case under Rule 122, which allows for the submission of a case without trial when sufficient facts have been established by stipulation or

[*4] other means.[1]  The evidence which the parties have stipulated is limited to the administrative record available to Appeals.  The parties agree on petitioner's tax liability for 2006.  The sole issue before us is whether petitioner has satisfied that liability with credits available to her for estimated tax payments.

## Background

### Petitioner's Residence

When she filed the petition, petitioner resided in Nevada.

### Premarital Agreement

Before petitioner married her late husband, Milton Schwartz, in 1993, the two of them executed a premarital agreement.  Paragraph Twenty-Seventh of that agreement provides:  "MILTON shall be liable for any [and] all taxes, interest, penalties, and other costs related to taxes incurred during the marriage of the parties, and MILTON agrees to hold ABIGAIL harmless from any such liability excluding income generated by the separate property of ABIGAIL or income generated directly by ABIGAIL's efforts during marriage."

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[*5] 2005 Overpayment; Estimated and Extension Payments for 2006

Petitioner and Milton filed a joint Federal income tax return for the taxable year ended December 31, 2005, that showed an overpayment of tax. On that return, they elected to apply their overpayment to their estimated tax for 2006.

Milton signed checks dated June 13, 2006, September 12, 2006, and January 12, 2007, drawn on the account of an irrevocable trust of which he was trustee. Each check was accompanied by an estimated tax payment voucher that gave both Milton's and petitioner's names and Social Security numbers.

Milton signed another check on the trust account, dated April 16, 2007, which accompanied a Form 4868, Application for Automatic Extension of Time To File U.S. Individual Income Tax Return, for 2006. The extension form names both Milton and petitioner and gives both of their Social Security numbers.

Divorce Proceedings

On January 24, 2007, a Nevada district court entered a decree of divorce in response to a complaint Milton had filed in April 2006.

In May 2007, Milton filed a motion with the divorce court requesting "an Order compelling * * * [petitioner] to pay her portion of the parties' 2006 taxes." The brief Milton submitted in support of his motion asserts as an undisputed fact that petitioner recognized a gain of about $1.5 million from the sale in January

[*6] 2006 of property she had purchased in 2001. Correspondence attached to Milton's motion indicates that he understood that the tax on petitioner's property sale was included in the extension payment, if not the prior estimated payments. Milton's brief further asserts that, while petitioner had continually acknowledged her responsibility for paying tax on that gain, including in testimony before the divorce court, she had refused to reimburse Milton for his payment of the tax. The brief thus described the requested order as one directing petitioner "to reimburse him". In March 2008, following Milton's death the previous August, the divorce court granted Milton's motion, concluding that petitioner was responsible "to pay any gains or obligations related to * * * [her] property."

Petitioner's 2006 Return

Petitioner filed her own return for the taxable year ended December 31, 2006. That return, as amended, claimed a filing status of married filing separately. The return reports estimated payments and an extension payment that, together, exceed the reported tax liability. The claimed credits equal half of (1) the overpayment shown on the 2005 joint return she filed with Milton, (2) the estimated payments Milton made between June 2006 and January 2007, and (3) the extension payment Milton made in April 2007.

**[*7]** <u>The 2010 Notice of Federal Tax Lien</u>

In September 2010, respondent notified petitioner's counsel that a Notice of Federal Tax Lien (NFTL) had been filed in regard to the collection of the unpaid tax liability of petitioner for her 2006 taxable year. In response, petitioner requested a collection due process (CDP) hearing. The request states the following grounds:

> The Commissioner erred in computing liability and credit. Taxpayer does not owe the amount assessed because IRS failed to give her proper credit for tax payments made on her behalf by her husband. In the alternative, taxpayer cannot pay what taxpayer owes. The Commissioner should not take enforced collection action because there exist less intrusive alternatives, namely an installment payment agreement or Offer in Compromise.

In June 2012, following a CDP hearing the previous December, petitioner and Appeals executed a Form 12257, Summary Notice of Determination, Waiver of Right to Judicial Review of a Collection Due Process Determination, and Waiver of Suspension of Levy Action (2012 summary notice). The 2012 summary notice states:

> At the hearing the issue raised was the transfer of the taxpayer's portion of a joint 2005 refund and her portion of the 2006 estimated payments.

> It was determined by Appeals that the Campus inappropriately transferred these credits back to her deceased husband's taxes for the same year.

**[*8]** The correct resolution is to credit the taxpayer with these amounts. This will eliminate the tax liability and the Notice of Federal Tax Lien will be released.

2013 Levy Notice

Notwithstanding the 2012 summary notice, respondent renewed collection activity concerning petitioner's 2006 tax liability, sending her a notice of intent to levy dated December 2013, which covered both 2006 and 2012.[2]  In response, petitioner (through her counsel), requested another CDP hearing, which led to the execution of a second Form 12257 in August 2014.  The 2014 summary notice states:  "Appeals does not sustain the proposed levy action as a collection alternative has been reached."  It then refers to the determination stated in the 2012 summary notice.

"Continuation" of Second CDP Hearing

In response to the transfer back to petitioner's account of the credits she claimed on her 2006 return in accordance with the 2012 summary notice, Milton's estate claimed entitlement to those credits and sought the assistance of the Taxpayer Advocate Service (TAS) to obtain them.  TAS sought advice from counsel, which supported the claim of Milton's estate.  Appeals thus concluded

---

[2]The parties have stipulated that petitioner's tax liability for 2012 has now been fully paid; consequently, that year is not before us.

**[*9]** that the determination reflected in the 2014 summary notice was incorrect and offered petitioner a "continuation" of the CDP hearing concerning the levy notice, which would allow her to seek judicial review of an adverse determination.

The continuation hearing was held on April 28, 2016. At that meeting, petitioner's representatives declined to discuss collection alternatives. Instead, they rested their case on petitioner's entitlement to the credits she claimed on her 2006 return.

Notice of Determination

The notice of determination (NOD) that gave rise to the present case was issued in June 2016. The NOD states Appeals' determination to uphold the proposed levy action to collect the unpaid tax liability for 2006. Appeals based its determination on petitioner's failure to offer collection alternatives and "on advice from counsel that the 2005 credit-elect and the 2006 estimated tax payments should be applied to * * * [Milton's] separate account for 2006 and his 2006 estimated tax payments are individual payments that should be applied only to his 2006 separate account".

Appeals determined that petitioner's and Milton's 2005 joint overpayment should be allocated entirely to Milton in accordance with an agreement between them. On the basis of advice from counsel, Appeals read the couple's premarital

[*10] agreement to impose on Milton "all taxes <u>except</u> taxes resulting from * * * [petitioner's] separate property or earnings". The NOD states: "Abigail's 2006 income tax liability was the result of the sale of her separate property, placing responsibility for its payment squarely on Abigail pursuant to the Agreement." The NOD also refers to Abigail's testimony before the divorce and expresses the view that that testimony "disclaimed all interest" in the joint 2005 overpayment. Appeals took the divorce court's order regarding the payment of 2006 taxes as confirmation of that view.

Appeals determined that Milton was entitled to credit for the estimated payments and extension payment he made on the basis of its finding that Milton intended those payments to have been for his own account. The NOD explains that finding as follows:

> The tax-related provisions of the [premarital] Agreement * * * seem to clearly indicate that these were individual estimated tax payments at the time they were made. * * * [T]he fact that under the Agreement, * * * [petitioner] was solely responsible for taxes on her separate property and earnings, and Milton controlled whether the parties filed joint weigh heavily toward a conclusion that the payments were individual payments rather than joint.

> The conclusion is also supported by the fact that, with the exception of the first payment [made on April 16, 2006], the payments were all made during the divorce. * * *

[*11] Additionally, Milton's intent was further demonstrated by letters he sent to Abigail demanding that she contribute her portion of the 2006 joint tax liability if the parties were going to file joint. The amount Milton demanded as contribution was intended to cover taxes that were ultimately reported on * * * [petitioner's] 2006 tax return.

Finally, there is (again) the fact that * * * [petitioner], while testifying in court, agreed that she was solely responsible for payment of her 2006 taxes.

## Discussion

I.    Statutory Provisions; Standard and Scope of Review

Sections 6320 and 6330 provide a taxpayer the right to notice and the opportunity for an Appeals hearing before the Commissioner can collect unpaid tax by means of a lien or a levy against the taxpayer's property. If a taxpayer requests a CDP hearing, the Appeals officer conducting the hearing must verify that the requirements of any applicable law or administrative procedure have been met. Secs. 6320(c), 6330(c)(1). The taxpayer may raise at the hearing any relevant issue relating to the unpaid tax or the collection action, including appropriate spousal defenses, challenges to the appropriateness of collection actions, and offers of collection alternatives. See sec. 6330(c)(2)(A). Section 6330(d)(1) allows a taxpayer to "appeal * * * to the Tax Court" a determination under section 6320 or 6330.

[*12] When a taxpayer's underlying liability is at issue in a CDP case, we review Appeals' determination de novo; otherwise, we review that determination for abuse of discretion. E.g., Goza v. Commissioner, 114 T.C. 176, 181-182 (2000). As we wrote in Melasky v. Commissioner, 151 T.C. 89, 92 (2018), aff'd, __ F. App'x __, 2020 WL 536259 (5th Cir. Feb 3, 2020): "A question about whether the IRS properly credited a payment is not a challenge to a tax liability". Therefore, our standard of review in the present case is abuse of discretion. "Under an abuse of discretion standard, 'we do not interfere unless the Commissioner's determination is arbitrary, capricious, clearly unlawful, or without sound basis in fact or law.'" Robinette v. Commissioner, 123 T.C. 85, 93 (2004) (quoting Ewing v. Commissioner, 122 T.C. 32, 39 (2004), vacated 439 F.3d 1009 (9th Cir. 2006)), rev'd, 439 F.3d 455 (8th Cir. 2006).

In some cases, we face a question concerning the scope of our review--in particular whether our review is limited to the administrative record. In Robinette v. Commissioner, 123 T.C. at 95, we held that, "when reviewing for abuse of discretion under section 6330(d), * * * our review is not limited to the administrative record." Since then, three Courts of Appeals have rejected that view, including that of the Ninth Circuit, to which appeal of the present case would normally lie. See Keller v. Commissioner, 568 F.3d 710, 718 (9th Cir.

[*13] 2009), aff'g in part T.C. Memo. 2006-166, and aff'g in part, vacating in part decisions in related cases; Murphy v. Commissioner, 469 F.3d 27, 31 (1st Cir. 2006), aff'g 125 T.C. 301 (2005); Robinette v. Commissioner, 439 F.3d 455. Although all three Courts of Appeals that have considered the issue have rejected our position that the record rule is inapplicable to CDP cases, we have not yet expressly overruled our Opinion in Robinette. Nonetheless, as we explained in Hinerfeld v. Commissioner, T.C. Memo. 2019-47, at *17-*19, some of our more recent Opinions call into question our rationale in Robinette. See also Kasper v. Commissioner, 150 T.C. 8, 17, 19 (2018); Porter v. Commissioner, 130 T.C. 115, 118, 120 (2008). Hinerfeld did not require us to reconsider our position on the applicability of the record rule because the result in that case would have been the same regardless of whether we limited our review to the administrative record. Similarly, the present case does not give us reason to address the continued viability of our Opinion in Robinette because the evidence which the parties have stipulated is limited to the administrative record available to Appeals.

II.     Petitioner's Arguments

Petitioner offers four grounds for her claim that Appeals abused its discretion in sustaining the proposed levy action to collect allegedly unpaid tax for her 2006 taxable year. First, she claims that the summary notices that she and her

[*14] counsel executed with respondent's representatives in 2012 and 2014 "constitute enforceable, binding contracts" in which respondent "agree[d] not to enforce collection" in regard to her 2006 taxable year.  She characterizes the issuance of the NOD as "reneging" on the prior summary notices.  Second, petitioner contends that the NOD "rescind[ed]" the prior summary notices in violation of Internal Revenue Manual (IRM) pt. 8.22.9.13 (Nov. 13, 2013).  Although petitioner accepts that "the I.R.M. does not bind this Court", she argues that "Appeals' failure to abide by I.R.M. § 8.22.9.13 here constitutes abuse of discretion".  Third, petitioner argues that, "[i]n the event the Court somehow finds respondent's Determinations are not enforceable contracts * * * respondent is estopped from denying his Determinations are enforceable on the grounds of equitable estoppel."  And fourth, petitioner contends that "respondent's decision to apply [to Milton's account] the entire 2005 joint payment and all 2006 estimated payments is erroneous as a matter of law and violates respondent's regulations."  For the reasons explained below, we conclude that none of petitioner's claims demonstrates an abuse of discretion.  Consequently, we will sustain Appeals' determination.

[*15] III.    Summary Notices as Binding Contracts

While CDP cases such as the one before us can be resolved by binding contracts, petitioner has not convinced us that respondent was contractually obligated, by reason of the summary notices, to refrain from any further action concerning the collection of tax from petitioner for her 2006 taxable year.  As we observed in Tucker v. Commissioner, 135 T.C. 114, 140 (2010), aff'd, 676 F.3d 1129 (D.C. Cir. 2012):  "If * * * [a] CDP officer or employee enters into an installment agreement under section 6159, a closing agreement under section 7121, or an OIC [offer-in-compromise] under section 7122 with the taxpayer, then of course the agency will be bound under general contract principles to honor the agreement."  But we concluded that determinations of Appeals personnel not reflected in such an agreement are not final and binding on the IRS.  Id. at 163-164.[3]

---

[3]Once a case is docketed before this Court, it can be settled by means of an agreement that does not meet the requirements of a closing agreement under sec. 7121.  In the prepetition context, however, secs. 7121 and 7122 provide the exclusive means of effecting a binding settlement.  See generally Dormer v. Commissioner, T.C. Memo. 2004-167, 2004 WL 1567747, at *5-*7.  Thus, petitioner's reliance on Dorchester Indus. Inc. v. Commissioner, 108 T.C. 320 (1997), aff'd, 208 F.3d 205 (3d Cir. 2000), is misplaced:  Those cases involved a settlement agreement entered into during their pendency before us.

**[*16]** Petitioner attempts to dismiss <u>Tucker</u> as having "nothing whatsoever to do with the issue of finality of respondent's Determinations." The principal issue in <u>Tucker</u> was concededly a constitutional issue not present in petitioner's case. The taxpayer in <u>Tucker</u> argued that the Appeals personnel involved in his case were officers who were not appointed in compliance with Article II, Section 2, Clause 2 of the Constitution (commonly referred to as the Appointments Clause). To address that issue, however, we had to consider whether Appeals personnel exercised "'final' decision-making power". <u>Tucker v. Commissioner</u>, 135 T.C. at 164.[4]

Moreover, even if we were to accept that the parties' execution of the summary notices resulted in binding contracts, we would find nothing in either notice that precludes respondent from subsequently reaching a determination contrary to that described in the notice. Each summary notice simply describes the

---

[4]In affirming our decision in <u>Tucker v. Commissioner</u>, 135 T.C. 114 (2010), <u>aff'd</u>, 676 F.3d 1129 (D.C. Cir. 2012), the appellate court relied on Appeals employees' "lack of discretion", and appeared to accept that their decisions had "effective finality * * * within the executive branch." <u>Tucker v. Commissioner</u>, 676 F.3d at 1134. To the extent that the Court of Appeals suggested that Appeals' decisions might be final, that suggestion is, of course, dicta. Moreover, the court may have meant only that Appeals' decisions bind those outside of the Office of Appeals. Thus, we do not read the appellate court's opinion in <u>Tucker</u> as establishing that Appeals itself cannot change its mind, on the basis of changed circumstances or otherwise.

[*17] disposition of a CDP proceeding involving petitioner's 2006 taxable year as of a given time, on the basis of information then available.

IV.    Respondent's Ability To Rescind Summary Notices

Petitioner's claim that respondent's notice of determination "rescind[ed]" the summary notices in violation of a directive in the IRM rests on a failure to differentiate between a notice of determination (Letter 3193) and a summary notice on Form 12257.  Because a taxpayer, in executing a summary notice, waives her right to request judicial review of Appeals' determination, Form 12257 is typically used only when a CDP hearing reaches a result satisfactory to the taxpayer.  See Michael I. Saltzman & Leslie Book, IRS Practice and Procedure, para. 14B.15[2], at 14B-62 (rev. 2d ed. 2018).  By contrast, a notice of determination gives the taxpayer the right to judicial review of Appeals' determination.[5]  See secs. 6320(c), 6330(d)(1).

IRM pt. 8.22.9.13, which petitioner alleges respondent to have violated, states the IRS Office of Chief Counsel's determination that "Appeals cannot rescind a Notice of Determination * * * in any circumstance."  It does, however,

_____

[5]Petitioner's failure to differentiate between a notice of determination and a summary notice is reflected in her characterization of the notice giving rise to this case as "respondent's third Summary Notice of Determination".  If that notice had been a third summary notice on Form 12257, petitioner would have been unable to petition this Court to review respondent's determination.

[*18] allow for a notice of determination to be amended during the 30-day period in which the taxpayer can petition this Court, provided no such petition has been filed. The reference to the possibility of a Tax Court petition confirms that IRM pt. 8.22.9.13 addresses notices of determination and not summary notices, in which the taxpayer waives the right to seek judicial review of Appeals' determination.

## V.    Equitable Estoppel

As we explained in Wilkins v. Commissioner, 120 T.C. 109, 112-113 (2003):

> Equitable estoppel is a judicial doctrine that precludes a party from denying its own representations which induced another to act to his or her detriment. The Court has recognized that estoppel is applied against the Commissioner "with the utmost caution and restraint." The taxpayer must establish the following elements before equitable estoppel will be applied against the Government: (1) A false representation or wrongful, misleading silence by the party against whom the estoppel is claimed; (2) an error in a statement of fact and not in an opinion or statement of law; (3) the taxpayer's ignorance of the truth; (4) the taxpayer's reasonable reliance on the acts or statements of the one against whom estoppel is claimed; and (5) adverse effects suffered by the taxpayer from the acts or statements of the one against whom estoppel is claimed. Estoppel requires a finding that the taxpayer relied on the Government's representations and suffered a detriment because of that reliance. [Citations omitted.]

Petitioner, as far as we can tell, makes no claim that respondent affirmatively made a false representation. Instead, she seems to claim that

[*19] respondent maintained a "wrongful, misleading silence" by keeping her "in the dark" concerning the facts of her case. And what facts does she feel entitled to have been apprised of? Apparently that her stepson, on behalf of his father's estate, pursued the transfer of the credits in issue from her account to the estate's account and that Appeals received legal advice contrary to the determinations made in the summary notices. Those, she claims, are the relevant "true facts" of which she was left "ignorant". She offers no reason, however, why respondent was obliged to disclose those facts to her sooner than he did. She suggests that, had she known of those facts earlier, she would have set aside assets to satisfy an obligation whose payment at this point would "result in her losing her home and all her assets". In her initial request for a CDP hearing, however, petitioner averred that she could not then pay the tax respondent sought to collect; consequently, she requested collection alternatives. Therefore, her relinquishment of assets sufficient to pay the tax apparently occurred before respondent's consideration of either the CDP case concerning the NFTL or the subsequent case concerning the levy notice at issue. Her failure to retain sufficient assets cannot have been induced by any actions respondent took in considering those cases.

We thus conclude that petitioner has not established that the traditional elements of equitable estoppel, as articulated in Wilkins, are present in this case.

[*20] Given that conclusion, we need not consider the additional conditions imposed by the Court of Appeals for the Ninth Circuit for applying equitable estoppel against the Government. Cf. Estate of Brocato v. Commissioner, T.C. Memo. 1999-424, 1999 WL 1261490, at *3.

VI.   Allocation of Estimated Payments

For the reasons explained above, we conclude that respondent is not bound by the determinations reflected in the two summary notices. Appeals was thus free to reconsider those determinations and the allocation between Milton's and petitioner's accounts of their 2005 overpayment and the estimated tax payments Milton made between June 2006 and April 2007. The question remaining is whether Appeals abused its discretion when it ultimately determined that petitioner is not entitled to credit for any of those amounts.

Section 1.6654-2(e)(5)(ii)(A), Income Tax Regs., provides that, if a couple makes a joint payment of estimated tax in regard to a year for which they end up filing separate returns "the payment made on account of the estimated tax for that taxable year may be treated as a payment on account of the tax liability of either the husband or wife for the taxable year, or may be divided between them in such manner as they may agree." In the absence of such an agreement, the estimated

**[*21]** payments are allocated between the two taxpayers in proportion to their separate tax liabilities. Sec. 1.6654-2(e)(5)(ii)(B), Income Tax Regs.

We begin by considering the allocation of the extension payment Milton made in April 2007. A different--and simpler--analysis applies to that payment than to the other amounts in issue. When Milton made that payment, the divorce court had entered its decree of divorce. Section 1.6654-2(e)(5)(i), Income Tax Regs., provides that "a joint payment of estimated tax may not be made if the husband and wife are separated under a decree of divorce or of separate maintenance." Therefore, as a matter of law, Milton's April 2007 payment was not a joint payment of estimated tax, regardless of his intent, and no portion of that payment can be treated under section 1.6654-2(e)(5)(ii), Income Tax Regs., as having been made on account of petitioner's 2006 tax liability.[6] Appeals thus did not abuse its discretion in allocating that payment entirely to Milton's account.

The parties have not called to our attention any legal rules that bear on the determination of whether the payments made on June 13, 2006, September 12, 2006, and January 12, 2007, were joint payments of estimated tax, and our own

_____

[6]Petitioner's contention that "Milton intended to pay all 2006 taxes for both parties even after the divorce" thus has no bearing on her entitlement to credit for any part of the payment Milton made in April 2007, after entry of the divorce decree.

[*22] research discloses no such rules. Therefore, we will treat that determination as factual, governed by Milton's intent in making the payments, and consider whether Appeals' finding that Milton intended the payments to be for his individual account was clearly erroneous.

The NOD cites four grounds for Appeals' finding that Milton intended the estimated tax payments he made between June 2006 and January 2007 to have been for his individual account rather than joint payments of estimated tax. First, the NOD cites the premarital agreement. Second, it observes that Milton made the payments in issue while the divorce proceeding was pending. Third, it refers to Milton's demand for reimbursement. And fourth, it relies on petitioner's alleged testimony before the divorce court in which she acknowledged her responsibility for paying tax on the gain from the sale of her property.[7]

The grounds Appeals cited do not support its factual finding. First, Milton's ability to choose to file either a joint return or a separate return does not establish that, when he made the payments in issue, he intended to file a separate return for 2006. (Indeed, as explained below, his demand for reimbursement of a portion of

---

[7]The record does not, so far as we can tell, include a transcript of the divorce proceedings. When respondent, on brief, refers to the testimony on which Appeals apparently relied, he cites only a description of that testimony included in the argument Milton submitted to the divorce court in support of his motion for an order concerning the payment of 2006 tax.

**[*23]** those payments shows that he expected to file a joint return for that year.) Second, the pendency of a divorce proceeding does not preclude the parties to that proceeding from filing joint income tax returns. Third, and most important, Milton's demand for reimbursement actually cuts against Appeals' finding. If Milton had anticipated filing a separate return for 2006 and thus made estimated payments only for his own individual account, he would not have been entitled to reimbursement. His right to reimbursement could arise only from his having made payments intended to cover a tax liability arising from petitioner's activities or separate property. Fourth, any acknowledgment by petitioner that the premarital agreement made her responsible, as an economic matter, for paying tax on the sale of her property would not be evidence of Milton's intent in making the estimated payments in issue.

We thus conclude that Appeals' factual finding regarding the intent underlying the estimated payments Milton made between June 2006 and January 2007 was clearly erroneous. Normally, our finding that a determination by Appeals rests on a clearly erroneous finding of fact would require us to remand the case. As a general rule, we cannot uphold such a determination on grounds other than those Appeals relied on. See SEC v. Chenery Corp., 332 U.S. 194 (1947); SEC v. Chenery Corp., 318 U.S. 80 (1943); Hinerfeld v. Commissioner,

**[\*24]** at \*21-\*27.  Instead, the <u>Chenery</u> doctrine generally requires us to allow an agency to address, in the first instance, matters committed to its administrative discretion.  In the present case, however, we know how Appeals would have treated the estimated payments Milton made between June 2006 and January 2007 if it had viewed them as joint payments.  On the basis of the principle reflected in Paragraph Twenty-Seventh of the premarital agreement, Appeals would have allocated any joint estimated payments under section 1.6654-2(e)(5)(ii), Income Tax Regs., in the same manner that it allocated the couple's 2005 joint overpayment.  If we conclude that Appeals did not err, as a matter of law, in allocating the 2005 overpayment entirely to Milton's account, we can also conclude, without improperly encroaching on Appeals' discretion, that it did not err in allocating the estimated payments in the same manner.

Petitioner and Milton indicated on their 2005 joint return their desire to apply the overpayment shown on that return to their estimated tax for 2006.  <u>See</u> sec. 301.6402-3(a)(5), Proced. & Admin. Regs.  Accordingly, respondent properly treated the 2005 overpayment as a joint estimated payment for 2006.

Applying to the facts at hand the rules of section 1.6654-2(e)(5)(ii), Income Tax Regs., we ask whether petitioner and Milton agreed to allocate their 2005 overpayment (and the estimated payments Milton made between June 2006 and

[*25] January 2007) in a manner other than in proportion to their separate tax liabilities. As far as the record discloses, petitioner and Milton did not reach an agreement on that specific question. Appeals relied instead on the premarital agreement Milton executed years before the question of the allocation of estimated payments for 2006 arose. That the premarital agreement does not include a provision that specifically addresses the allocation of joint estimated payments made for a year in which the parties end up filing separate returns, however, does not prevent it from governing the allocation of the amounts in issue under section 1.6654-2(e)(5)(ii)(A), Income Tax Regs. That provision of the regulations requires allocation of joint estimated payments "in such manner as * * * [the parties] may agree." It does not specify how that agreement is to be evidenced or indicate that effect will be given only to an agreement that specifically concerns the allocation of estimated payments. Therefore, if the premarital agreement establishes a general principle whose application directs a particular allocation of the amounts in issue, the agreement will govern for purposes of section 1.6654-2(e)(5)(ii)(A), Income Tax Regs.[8]

---

[8]Petitioner argues that, because the premarital agreement "applies only to the parties as between themselves and not respondent", the agreement, as interpreted by the divorce court, "is not relevant to the issue of petitioner's tax liability to respondent". Any agreement between a husband and wife regarding an

(continued...)

[*26] We agree with respondent that the premarital agreement establishes such a principle. Paragraph Twenty-Seventh of that document assigns to petitioner the economic burden of any tax liability arising from "income generated by the separate property of * * * [petitioner] or income generated directly by * * * [petitioner's] efforts during marriage." Both petitioner and respondent read the agreement as establishing that basic principle. Their interpretations of the agreement differ only in the mechanics by which that principle is to be implemented. Petitioner reads the agreement as having required Milton to have paid, in the first instance, all tax arising during their marriage. If any tax Milton were to pay arose from petitioner's own property or activities, petitioner acknowledges, she would have been required to reimburse him. Respondent counters: "That interpretation of the agreement makes no sense." We see no cause for resolving the parties' dispute about the mechanics of implementation. The general principle that both parties read the premarital agreement as having

---

[8](...continued)
allocation of joint estimated payments, however, would by definition be between the two of them. The Commissioner would seldom, if ever, be a party to the agreement. Any such agreement would affect the amount of tax each spouse owes to the Commissioner, however, because, under the governing regulation, it would determine the allocation between them of joint estimated payments.

[*27] established requires that the joint estimated payments made for 2006 (including the 2005 overpayment) be allocated entirely to Milton.

If any of the joint estimated payments were allocated to petitioner, she would, to that extent, be relieved of the economic burden of the tax liability on her separate income for 2006. Petitioner makes no claim that she funded any of the estimated payments in issue. We find no evidence in the record that petitioner had an interest in the trust account from which Milton made the payments. We also find no evidence of the source of the payments that gave rise to the overpayment shown on petitioner's and Milton's 2005 joint return, but, again, petitioner makes no claim that she funded any part of those payments.

Our conclusion might be different if we had evidence that petitioner had reimbursed Milton for any of the estimated payments in issue. To that extent, she could be viewed as having "bought into" a share of the credits for those payments. Allocating to her any portion of the estimated payments for which she reimbursed Milton would not relieve her of the economic burden of the liability for tax on her own income. But the record provides no evidence that petitioner ever reimbursed Milton (or his estate or its beneficiaries) for any portion of the estimated payments he made.

[*28] Petitioner's interpretation of the premarital agreement would subordinate the general principle established by Paragraph Twenty-Seventh of the agreement to the specific mechanics of its implementation. As petitioner reads the agreement, its principal import was that she was never required to pay to the IRS tax arising during her marriage to Milton. Instead, he was always required to pay all of the tax in the first instance. Her only obligation was to reimburse him for any tax he paid on her income. But she acknowledges that the record provides no evidence that she reimbursed Milton's estate or its beneficiaries for the tax on her 2006 income and, moreover, she makes no claim that she did so. Therefore, under her reading of the premarital agreement, she would end up realizing the windfall of having her 2006 tax liability paid with Milton's funds unless, at this late date, Milton's estate (or, more likely, its beneficiaries) were able to--and did--enforce her reimbursement obligation.

On the other hand, upholding respondent's allocation to Milton of the credits arising from the estimated payments made for 2006 would extinguish any remaining reimbursement obligation. Any claim for reimbursement would depend on Milton's having paid tax on petitioner's income. Allocating the estimated payments for 2006 entirely to Milton, as respondent now seeks to do, would mean that Milton's funds would ultimately satisfy only his own tax liability.

[*29] Nothing in the divorce court's order concerning petitioner's and Milton's 2006 tax liabilities compels a different conclusion. The court acted in response to Milton's request for "an Order compelling * * * [petitioner] to pay her portion of the parties' 2006 taxes." In his argument in support of his motion, Milton anticipated an order directing petitioner "to reimburse him". That characterization of the requested order, however, reflected the premise that he had "paid the tax" due from petitioner's sale of her own property. When the divorce court granted Milton's order, it concluded that petitioner was responsible "to pay any gains or obligations related to * * * [her] property." It did not mandate that the contemplated payment take the form of reimbursement to Milton. Thus, whatever amounts petitioner pays as a result of the levy action upheld by the NOD would satisfy her obligation under the divorce court's order.

In sum, we agree with Appeals that Paragraph Twenty-Seventh of the premarital agreement petitioner executed with Milton establishes a general principle that requires the allocation entirely to Milton's account of the overpayment shown on the joint return petitioner filed with Milton for 2005. That same analysis applies to the estimated payments Milton made between June 2006 and January 2007. Thus, Appeals did not err, as a matter of law, in allocating

[*30] entirely to Milton's account the credits for those payments, as well as the joint 2005 overpayment.

We sympathize with petitioner's frustration at having received inconsistent determinations regarding the payment of her tax liability for 2006. Respondent's handling of her case was not ideal. But we also appreciate the challenge respondent faced in adjudicating competing claims for credit of the same amounts. In an organization as large as the IRS, the right hand may not always know what the left is doing, and efforts to coordinate the treatment of conflicting claims to credit for payments and handling those claims consistently can be complicated. It would have been easier for all involved if respondent had adhered to a single position regarding the allocation of the credits. But, for the reasons explained above, Appeals was entitled to change its position regarding petitioner's entitlement to the credits. And Appeals' ultimate position, though contrary to prior determinations, did not reflect an abuse of discretion. Petitioner does owe--and always has--the tax respondent seeks to collect. The record provides no evidence that petitioner was prejudiced by the initial determinations that the credits she claimed satisfied her liability. As noted above, her stated interest in pursuing collection alternatives in her initial CDP hearing suggests that, if she has indeed failed to preserve assets sufficient to pay the tax, that failure occurred before

**[\*31]** Appeals' consideration of either the NFTL or the levy notice. If paying the amount she owes at this point would cause her financial hardship, she should have requested consideration of collection alternatives at the April 28, 2016, hearing, instead of acquiescing in her representatives' pursuit of an all-or-nothing strategy to avoid collection altogether.

Because Appeals did not abuse its discretion in approving the proposed levy action to collect petitioner's unpaid income tax for her 2006 taxable year, we will sustain Appeals' determination.

<u>Decision will be entered for</u>

<u>respondent</u>.